F IL.ED

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

01 SEP 26 PM 1: 36

U.S. DISTRICT COURT
N.D. OF ALABAMA

MARTHA JO TERRY DANIEL,     )
                            )
    Plaintiff,              )
                            )
v.                          )     CIVIL ACTION NO.:  CV-00-B-1431-NW
                            )
DR. EDISON BARNEY AND       )
ANN MOORE,                  )
                            )
    Defendants.             )
                            )

ENTERED

SEP 2 6 2001

## MEMORANDUM OPINION

Currently before the court is defendants' Motion for Summary Judgment.  Upon

consideration of the record, the submissions of parties, the argument of counsel, and the relevant

law, the court is of the opinion that defendants' Motion is due to be granted.[1]

This action arises from an incident occurring on May 1, 1998, when Martha Jo Terry

Daniel ("Daniel" or "plaintiff"), a school social service worker employed by the Florence City

---

[1] At the conclusion of oral argument, the court informed the parties of its intention to grant summary judgment in favor of defendants.  The court requested that counsel for defendants prepare a proposed memorandum opinion for the court and required that counsel send a copy of the proposed opinion to counsel for plaintiff.  Although the court has made some changes to the opinion prepared by defendants' counsel, it has adopted a large part of the proposed opinion. The court is aware of the admonition of the Eleventh Circuit that district courts not delegate "the task of drafting important opinions to litigants."  *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 n.46 (11th Cir. 1997).  This is an important opinion and the court had reached a firm decision as to the appropriate outcome before requesting a proposed opinion from defendants' counsel.  In this case defendants' counsel drafted the opinion according to the express instructions of the court as to its contents.  These instructions were stated to defendants' counsel, with plaintiff's counsel present, following oral argument.

66

School System, was attacked and injured by a special needs student[2] at the Richards Center.[3] (Pl.'s Compl. ¶¶ 1, 10.)  Daniel contends that the defendants, Dr. Edison Barney ("Barney") and Dr. Ann Moore ("Moore") denied her due process of law because they were allegedly on notice of John Doe's violent behavior and acted with deliberate indifference by failing to take measures to ensure the safety of Daniel and other employees charged with the counseling and education of John Doe.  (Id. ¶ 15.)

In addition to her Fourteenth Amendment allegations, Daniel also asserts claims under the law of the State of Alabama, including claims of willful/intentional/reckless conduct, (Id. ¶¶ 20-22, 26-28), denial of a safe place to work, (Id. ¶¶ 23-25) outrage, (Id. ¶¶ 17-19),  negligence, (Id. ¶¶ 29-32), breach of contract, (Id. ¶¶ 33-36), and negligent supervision, (Id. ¶¶ 37-40). Daniel acknowledges that her claims for negligence and breach of contract are due to be dismissed, (Pl.'s Brief in Opposition ("Pl.'s Brief") at 39-40), and an order of dismissal of these claims will be entered.  This Memorandum Opinion addresses Daniel's remaining claims.

## I. FACTUAL SUMMARY[4]

On or about November 1, 1977, Daniel was employed by the Florence City Board of Education as a "school social service worker" to provide child advocacy, evaluatory, and other institutional services to special needs children within the Florence City School System.  (Pl.'s

---

[2]  This student will hereinafter be referred to as "John Doe" or "the student in question."

[3] The Richards Center is the administrative office for the Florence City Board of Education. (Daniel Depo. at 10-11.)  The offices of the Superintendent, Assistant Superintendent, Special Education Supervisor, and others are also located at the Richards Center. In addition to housing the Board's central office, a small amount of space at the Richards Center is used to teach approximately five disabled students.  (Daniel Depo. at 17-18, 22.)

[4] All reasonable inferences from admissible evidence are drawn in favor of Daniel. See e.g., Patrick v. Floyd Med. Ctr., 201 F.3d 1313, 1315 (11th Cir. 2000).

Compl. ¶1.)  Defendant Barney served as the Superintendent of Florence City Schools from 1993 to January 1, 2001, when he retired.  (Barney Depo. at 13.)  Defendant Moore was Assistant Superintendent of the Florence City Schools from 1991 to December 1999, when she resigned to become the Deputy Superintendent of Huntsville City Schools, the position she held at the time of her deposition.  (Moore Depo. at 11, 20.)

At the time of the assault, Margie Kingsley ("Kingsley") was the Florence school system's Supervisor of Special Education.  (Kingsley Depo. at 10, 24.)  In addition to educating special needs students in regular schools and in the alternative school,[5] the Florence school system educates some students in the Community Homebound Program at the Richards Center.[6] (Barney Depo. at 61-62; Daniel Depo. at 22.)  At the time of the incident, Lynn Sharp ("Sharp") taught academics and Daniel taught life skills to the students in the Community Homebound Program at the Richards Center.  (Daniel Depo. at 36.)  The classes were held in an office shared by Sharp and Daniel.  (Daniel Depo. at 18.)

Sharp and Daniel were the Board's best two employees in dealing with children with emotional needs.  (Kingsley Depo. at 97-98.)  In fact, Daniel was called on to work with the children at the Richards Center because she had lengthy relationships with the students placed there.  (Daniel Depo. at 38.)  Daniel began working in the Florence system in 1977 and worked primarily with behaviorally disordered students throughout her tenure.  (Daniel Depo. at 105,

---

[5] Alternative school is a school created by the Florence City School System for children with disciplinary problems.  Both regular schools and the alternative school employ male instructors, male coaches, security guards, disciplinary officers, security surveillance, and metal detectors located at the building entrance for safety purposes. (Daniel Aff. at 2 n. 1, 3.)

[6] At no time were any security measures implemented at the Richards Center to protect against the possibility of violent behavior by the students educated there.  (Daniel Aff. at 3.)

3

109.)  Daniel had comprehensive knowledge of the system's disability programs and had the

opportunity for training in any area that she felt a need.  (Kingsley Depo. at 22-24.)  In fact,

Daniel had attended training sessions, seminars, conferences and in-service workshops regarding

angry and violent clients, Individual Education Program documentation and other special

education issues while employed by the Board.  (Daniel Depo. at 111-12; Behrends Aff. and

attached Exhibits.)  Sharp also had attended seminars concerning  special education issues,

including Prevention and Management of Aggressive Behavior and Discipline workshops.

(Behrends Aff. ¶ B, and Exs. attached thereto.)  Daniel had served as the chairman of the

multineeds team for Lauderdale County,  an appointed group that met and discussed children

with needs beyond education and mental health.  (Daniel Depo. at 116-17.)  She co-led an

education program at SafePlace, Inc., for men with problems with domestic violence, in which

she helped these men handle their frustration or anger in non-violent ways.  (Daniel Depo. at

113-15.)  It is undisputed that Daniel was experienced and well-trained in working with

aggressive and violent children and adults.

The Individuals with Disabilities Education Act ("IDEA"), codified at 20 U.S.C. §§1400

*et seq.*, dictates the educational placement procedure for children designated as "special needs

students."  The education of each special needs student is governed by an Individualized

Education Program ("IEP").  *See* 20 U.S.C. § 1414(d).  This plan is created by an IEP Team

composed of the student's parent, a special education teacher or representative, and others that

are knowledgeable about the student.  *See id.*  The IEP must place the disabled student in *the

least restrictive* environment appropriate.  *See* 20 U.S.C. §1412(a)(5)(A).  In the Florence City

School System, the placement of each special needs student is controlled by the IEP Team, in

4

accordance with the IDEA.  (*See* Barney Depo. at 103-05, 109, 111; Kingsley Depo. at 18-20; Moore Depo. pp. 35-37, 70.)  The IEP Team holds the ultimate responsibility of determining the initial placement and any change in placement of a special needs student.  (*See* Moore Depo. at 35-37, 70; Barney Depo. at 61-62.)

John Doe had been a special needs student in the Florence school system since beginning kindergarten in 1991.  (*See* Daniel Depo. at 91.)  John Doe's student file shows an educational career marked by violence and disciplinary problems.  (See Daniel Aff., and Ex. 1 attached thereto.)  He attacked children, teachers, and a school principal.  (*Id.*)  He was suspended on numerous occasions in response to these disciplinary problems.  (*Id.*)

Daniel knew of John Doe even before he began kindergarten.  (Daniel Depo. at 100.)  In fact, Daniel had instructed Doe's mother, who had also been in the Florence special education program.  (*Id.*)  From the time Doe was of kindergarten age up to the May 1, 1998, incident, Daniel attended meetings and made decisions concerning Doe's abilities, educational prospects and eligibility for special education services.  (Daniel Depo. at 78-101.)  Daniel participated in and,  by signature, expressed her agreement with the conclusions of Doe's Multidisciplinary Eligibility Reports[7] dated May 20, 1991; August 28, 1991; May 24, 1993.  (Daniel Depo. at 91-92, 96-97, and Exs. 4, 5 attached thereto.)  She served on Doe's IEP Team, which determined the placement of the child within the school system.  She attended and participated in the

_____

[7] A teacher who determines that a child is experiencing learning, behavior, speech, or hearing problems may refer the child to special education personnel.  Those personnel evaluate the child and complete a Multidisciplinary Eligibility Report stating whether or not the child is eligible for special education services.  (Daniel Depo. at 88-92.)

development of IEPs for John Doe on June 26, 1993; April 22, 1997; February 5, 1998; and

March 9, 1998. (Daniel Depo. at 80, 86, and Exs. 1, 2 attached thereto.)

Both Daniel and Kingsley were familiar with several incidents of physical aggression and

violence that Doe had committed. (Kingsley depo., p. 108). In late 1997 or early 1998, John

Doe was placed in the special education program at Hibbett Middle School. (Daniel Depo. at 25;

Def.'s Elizabeth Renault ("Renault") Aff. ¶ 4; Jim Smith ("Smith") Aff. ¶2.) One of John Doe's

teachers at Hibbett, Elizabeth Renault ("Renault"), testified that she discussed the student's

volatile, aggressive behavior with Moore on one occasion. (Def.'s Renault Aff. ¶ 4.) Renault

told Moore that she felt Doe's presence at Hibbett posed a threat to the students and teachers

there and that she was personally afraid to continue teaching this child. (Pl.'s Renault Aff. at 3-

4.) Renault specifically requested that Doe immediately be removed from Hibbett. (*Id*. at 4.)

Moore told Renault that she would talk to Kingsley about the concerns and ask Kingsley to call

Renault. (Def.'s Renault Aff. ¶ 4.) Kingsley called Renault about this matter within a day or

two. (*Id*. ¶ 5.) The faculty at Hibbett did not think it could meet John Doe's needs, and

requested an IEP Team meeting, asking both Daniel and Kingsley to participate. (Kingsley

Depo. at 62.) Daniel and Kingsley participated in the meeting regarding the student's placement.

(Daniel Depo. at 25-26; Kingsley Depo. at 55.)

Later, in late January, 1998, John Doe attacked Jim Smith, the principal at Hibbett.

(Daniel. Depo. at 28-29; Smith Aff. ¶ 3.) Both Daniel and Kingsley were aware of the incident

involving Doe's attack on Smith. (Daniel Depo. at 28.) Within a few days of the incident,

Smith suspended John Doe from school. (Daniel Depo. at 28-29; Smith Aff. ¶ 3.) Smith did not

talk to Barney or Moore regarding this incident. (Smith Aff. ¶ 3.) After the meeting at Hibbett

and the incident with Smith, Daniel and Kingsley discussed changing Doe's placement. (Daniel Depo. at 29-30.) Kingsley believed that Doe's program was not working at Hibbett. (Kingsley Depo. at 58.) Doe needed a more self contained program than Hibbett allowed. (*Id*.) Kingsley and Daniel discussed the child's needs and the different options available.[8] (*Id*. at 65-68.) There were a number of viable options including the alternative school, a program at Bradshaw High School for children with moderate disabilities, and the Community Homebound Program at the Richards Center, a residential program, and one-on-one instruction.[9] (*Id*. at 67.) The alternative school was a more restrictive environment than the Community Homebound Program. (*Id*. at 66-67.) According to Kingsley, the IEP Team could have created any kind of program it deemed appropriate. (*Id*. at 68.)

On February 5, 1998, John Doe's IEP Team, consisting of Doe's mother, Kingsley, and Daniel, revised his IEP, placing him at the Community Homebound Program at the Richards Center from 8:00 to 10:00 a.m. on weekdays. (Daniel Depo. at 80-81, and Ex. 1 attached thereto.) Daniel signed Doe's IEP, indicating her attendance at that meeting. (*Id*.) Daniel does not recall voicing any disagreement with the IEP Team's placement decision. (Daniel Depo. at 31.) After Doe was placed at the Richards Center, the IEP team again revised his IEP to allow him to stay at school until 11:30 a.m. (Daniel Depo. at 38-40, and Ex. 1 attached thereto.) The revised IEP was written by Daniel and was signed by Daniel and Kingsley. (*Id*.) At this

---

[8] Kingsley testified that she may have discussed with Moore some of the steps that she and Daniel were taking to investigate the best placement for this child. (Kingsley Depo. at 131-32.) However, Kingsley does not recall talking about the matter with Barney. (*Id*. at 132-33.)

[9] Daniel does not recall whether or not placement alternatives other than the Richards Center were discussed. (Daniel Depo. at 30-31.)

meeting, Daniel did not raise any concerns for her safety or the safety of others.  (Daniel Depo. at 39.)

After John Doe was re-assigned from Hibbett to  Richards, there were no incidents of violence or other problems involving him until May 1, 1998.  (Kingsley Depo. at 97, 129; Daniel Depo. at 44.)  Daniel did not request that Doe's placement be changed or that greater security be provided.  (Daniel Depo. at 11, 15, 43, 74-75.)  In fact, no one requested more security at the Richards Center, (Kingsley Depo. at 48), and no one told either Barney or Moore of any concern about Doe, (Daniel Depo. at 11, 18, 69; Barney Depo. at 218-219; Moore Depo. at 66-67).

On May 1, 1998, Daniel left the central office at approximately 10:15 to go to Brandon Elementary School to pick up lunches for the students.  (Daniel Depo. at 44-45.)  When Daniel returned, Sharp told her that Doe had grabbed another student and had pushed  Sharp into a filing cabinet.  (*Id*. at 45-46, 50-51.)  Daniel was told that John Doe was across the hall from the regular classroom in a workroom that was occupied by Susan Key ("Key"), Special Education Secretary.  (*Id*. at 45.)  Daniel made no effort to contact Moore or Barney regarding the Sharp incident.  Indeed, while Daniel knew about  the morning incident with Sharp, (*Id*. at  50), neither Barney nor Moore was aware of it.  (Barney Depo. at 80-82; Moore Depo. at 105.)   Daniel took John Doe's lunch into the work room, and Key then left the room.  (Daniel Depo. at 45-48.)  To Daniel, the student appeared visibly agitated.  (Daniel Depo. at 46.)  Daniel voiced no concerns to Key, Sharp or Kingsley.  (Daniel Depo. at 48.)  Daniel unwrapped the student's lunch and invited him to sit down with her.  (Daniel Depo. at 46.)  When the student said he was going get a coke,  Daniel told the student that he had not earned the right to get a coke that day and he would have to drink his milk.  (Daniel Depo. at 47.)  The student screamed at Daniel, grabbed

8

her around the neck and hit her in the face. (Daniel Depo. at 47.) As a result, Daniel received neck injuries, requiring anterior cervical disc fusion of disks four through seven. (Daniel Depo. at 137.) She experiences constant pain from muscle spasms. (Id. at 138.) She is permanently and totally disabled. (Id.)

Neither Barney nor Moore ever served as a member of Doe's IEP Team. (Moore Depo. at 60; Daniel Depo., Exs. 1-3 attached thereto.) Daniel has no knowledge that the defendants knew of John Doe's violent tendencies before the May 1, 1998, incident. (Daniel Depo. at 59.) Daniel does not recall either defendant being at any meeting concerning John Doe. (Id. at 99.) Neither participated in the team's deliberations or in its final placement determination. (Id.).[10] In fact, Barney and Moore did not direct that this student or any other student be placed at the Richards Center. (Daniel Depo. at 123-24.) Barney and Moore were not even aware of Doe's placement at the Center until they were informed of the IEP team's final decision. (Moore Depo. at 69.) Daniel never told either that she believed that the Richards Center was not safe. (Daniel Depo. at 11.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991); see Adickes v. S.H.

---

[10] Moore was not informed by Kingsley of this placement until after the decision was made to place John Doe at the Richards Center. (Moore Depo. at 169-70.) Moore followed her usual routine of asking Kingsley whether all those who had signed off on the IEP were in agreement with the placement and Kingsley assured her they were. (Id.)

*Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e)

requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue

for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of

inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be

believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless,

the nonmovant need not be given the benefit of every inference but only of every *reasonable*

inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

Defendants seek summary judgment because 1) they are immune; 2) the alleged conduct

does not "shock the conscience;" and thus defendants are not liable under plaintiff's Fourteenth

Amendment Claim; 3) Daniel's co-employee, safe place to work and willful/reckless conduct

claims fail under Alabama law; (4) there was no outrageous conduct; 5) the evidence does not

support plaintiff's claim for negligent supervision and, in any event, having accepted workers

compensation benefits, plaintiff must prove willful conduct to recover under state law.

Defendants are entitled to summary judgment on all counts.

A.    **DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY UNDER FEDERAL LAW AND DISCRETIONARY FUNCTION IMMUNITY UNDER STATE LAW**

1.    **Qualified Immunity from Section 1983 Action**

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Lassiter v. Alabama A&M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994).  The Supreme Court has held that government officials performing discretionary functions are shielded from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity ensures that defendants can reasonably anticipate whether their actions will subject them to liability by attaching liability only if "[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *U.S. v. Lanier*, 520 U.S. 259, 270 (1997) (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The qualified immunity defense consists of an objective reasonableness standard giving those asserting the defense the "benefit of the doubt" so long as the action taken was not "so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed" the act. *Wood v. City of Lakeland, FL,* 203 F.3d 1288, 1291 (11th Cir. 2000) (citations omitted).

Application of a two step analysis determines whether a government official acted in good faith and is therefore entitled to qualified immunity.  First, the government official must prove that he was acting within the scope of his discretionary authority when the allegedly

11

wrongful acts occurred. *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988). If the defendant satisfies this burden, then the burden shifts to plaintiff to show defendant's lack of good faith. *Rich*, 814 F.2d at 1564. To meet this burden, plaintiff must show that the official's actions violated clearly established federal statutory or constitutional rights of which a reasonable person would have known. *See Priester*, 208 F.3d at 926.

Barney and Moore have established the first prong of the test, because it is undisputed that each was acting within the scope of his or her official authority at the time Daniel was injured. When Daniel was injured, Barney was "Superintendent of the Florence City School System" and was "performing the duties of his office [and] was acting under color of law." (Pl.'s Compl. ¶ 13.) Moore was "Assistant Superintendent" and was "performing the duties of her office [and] was acting under color of law." (Id. ¶ 14.)

Because each defendant was acting within the scope of his or her authority, the burden shifts to plaintiff to show lack of good faith on the part of defendants. *See Rich*, 814 F.2d at 1564. Plaintiff may meet that burden by demonstrating that defendants violated clearly established federal statutory or constitutional rights of which a reasonable person would have known. *See Priester*, 208 F.3d at 926. In an attempt to meet this burden, Daniels asserts that defendants violated her Fourteenth Amendment right to protection from bodily injury. (Pl.'s Compl. ¶ 15.) However, referring to general rules or abstract rights does not suffice to discharge plaintiff's burden. *See Wilson v. Strong*, 156 F.3d 1131, 1134 (11th Cir. 1998). In *Lassiter*, the 11th Circuit said:

> For the law to be clearly established to the point that qualified
> immunity does not apply, the law must have earlier been
> developed in such a concrete and factually defined context to make

12

> it obvious to all reasonable government actors, in the defendant's
> place, that 'what he is doing' violates federal law.

28 F.3d at 1149 (citation omitted). Therefore, plaintiff's reference to the broad right of

protection from bodily harm does not suffice to carry her burden. The facts in the case at hand

need not be identical to the facts in the prior case, but they need to be materially similar. *See id.*

at 1150 (citation omitted). "For qualified immunity to be surrendered, preexisting law must

*dictate*, that is, *truly compel* (not just suggest or allow or raise a question about), the conclusion

for every like-situated, reasonable government agent, that what the Defendant is doing violates

federal law in the circumstances." *Id.* (emphasis added). If case law, in factual terms, has not

staked out a bright line, then qualified immunity protects the defendant. *Priester*, 208 F.3d at

926 (quoting *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)). This shield is lost only in

exceptional cases. *Lassiter*, 28 F.3d at 1149.

Since *Lassiter*, Eleventh Circuit decisions have required exacting clarity in pre-existing

law if qualified immunity is to be lost. For example, in *Rodgers v. Horsley*, the court said:

> The question in this case is not whether, in general, involuntarily
> committed patients have a legally cognizable interest under the
> Fourteenth Amendment to safe conditions. Obviously, they do.
> Instead, the question, in this case, as in all qualified immunity
> cases is fact specific: in May 1991 was it clearly established in this
> circuit that it was unconstitutional for a mental institution to fail to
> supervise a patient for fifteen minutes in the smoking room, when
> she was on close watch for a health problem, when the institution
> had a history of some "sexual contact" involving patients other
> than plaintiff but no history of rape for the past twelve years,
> where a previous patient who was to be similarly monitored
> disappeared, apparently escaped through a bathroom window, and
> fell to her death on a ledge below, and where the plaintiff had
> never before complained of unwanted sexual contact from either
> the patient accused, any other patient, or any member of the staff.

39 F.3d 308, 311 (11th Cir. 1994). This case illustrates the type of fact specific development of the law necessary to lose qualified immunity.

Plaintiff, more specifically, claims that defendants violated her rights by failing to take stronger security measures at the Richards Center in light of their awareness of the severe behavioral problems of the students there. (Pl.'s Brief in Opposition ("Pl.'s Brief") at 27-33.) Following the rationale of *Rodgers*, defendants have qualified immunity unless, in May, 1998, it was clearly established in the Eleventh Circuit that it was unconstitutional for a superintendent or assistant superintendent of a school system either to fail to implement security measures to protect the instructors and other students in a special needs classroom from a student with a history of some violence or to override the decision of the student's IEP Team by insisting that he be placed elsewhere.

Daniel cites no case and the court is unaware of any case suggesting that defendants' failure to override the decision of Doe's IEP Team or failure to add more security at the Richards Center violated "clearly established law." Plaintiff has not met her burden of showing that defendants did not act in good faith, because she has not shown that they violated preexisting law.

Furthermore, preexisting law shows that, contrary to plaintiff's assertions, she had no constitutional right to any minimal level of safety or security in the workplace. In *Collins v. City of Harker Heights*, the Supreme Court held that the Fourteenth Amendment Due Process Clause does not impose an affirmative obligation on the state to maintain certain minimal levels of safety and security in the workplace. See 503 U.S. 115, 127 (1992). In *White v. Lemacks*, the Eleventh Circuit followed *Collins*, and rejected the claim that "a government employer had a

14

Case 3:00-cv-01431-SLB   Document 66   Filed 09/26/01   Page 15 of 35

federal constitutional obligation to provide its employees with certain minimal levels of safety and security in the workplace." 183 F.3d 1253, 1256 (11th Cir. 1999).

Defendants are entitled to qualified immunity if similarly situated, reasonable individuals "*could have* believed his or her actions were lawful in light of clearly established law." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) (emphasis added). Even if defendants did know of John Doe's violent propensities, plaintiff cannot show that they were violating clearly-established law, given the *Collins* holding that the Due Process Clause imposes no affirmative obligation on the state to provide a safe workplace. Because defendants were not violating clearly-established law, they were acting in good faith. Consequently, defendants are entitled to qualified immunity from plaintiff's § 1983 claim.

### 2.    Discretionary Function Immunity as to State Law Claims

Under Alabama law, defendants are entitled to discretionary function immunity from plaintiff's state law claims. *See Godby v. Montgomery County Bd. of Educ.,* 996 F.Supp. 1390 (M.D. Ala. 1998); *Ex parte City of Gadsden,* 781 So. 2d 936 (Ala. 2000); *Carroll ex rel. Slaught v. Hammett,* 744 So. 2d 906 (Ala. 1999); *Ex parte Kelley*, 739 So. 2d 1095 (Ala. 1999); *Louviere v. Mobile County Bd. of Educ.,* 670 So. 2d 873 (Ala. 1995); *D.A.C. ex. rel. D.D. v. Thrasher*, 655 So. 2d 959 (Ala. 1995); *Byrd v. Sullivan*, 657 So. 2d 830 (Ala. 1995); *Nance ex. rel. Nance v. Mathews*, 622 So. 2d 297 (Ala. 1993)*; Hayes ex. rel. Hayes v. Walters,* 628 So. 2d 558 (Ala. 1993); *Phillips v. Thomas*, 555 So. 2d 81, 84-86 (Ala. 1989); *Grant v. Davis*, 537 So. 2d 7 (Ala. 1988); *Bathgate v. Mobile Bd. of Sch. Comm'rs,* 689 So. 2d 109 (Ala. Civ. App. 1996); *Foley v. Taylor*; 695 So. 2d 1196 (Ala. Civ. App. 1997). "City officials acting within the general scope of their authority have a qualified or discretionary immunity and are not subject to

15

tort liability for an administrative act or omission." *Gibson v. City of Alexander City*, 779 So. 2d

1153 (Ala. 2000)(citing *Taylor v. Shoemaker*, 605 So. 2d 828 (Ala. 1992)). Like county boards

of education, city boards of education are also immune from suits for tort liability. *See Steiger v.*

*Huntsville City Bd. of Educ.*, 653 So. 2d 975 (Ala. 1995)(citing *Enterprise City Bd. of Ed. v.*

*Miller*, 348 So. 2d 782, 784 (Ala. 1977)). A governmental agent is immune from liability if the

acts in question required the agent to exercise some degree of discretion. *Bathgate*, 689 So. 2d at

111; *Carroll*, 744 So. 2d at 910. Discretionary acts are "those acts [as to which] there is no hard

or fast rule as to [the] course of conduct that one must or must not take. . . [;] [those requiring]

exercise in judgment and choice and [involving] what is just and proper under the

circumstances." *Louviere*, 670 So. 2d at 877.

The Alabama Supreme Court has consistently held that school teachers and

administrators are entitled to qualified immunity from suits arising out of the commission of

discretionary acts. *See Godby,* 996 F.Supp at 1415-1416 (holding that superintendent and school

board sued by a student for negligent supervision were entitled to discretionary function

immunity because supervision of principals in the school system involve the exercise of

"judgment and choice"); *Louviere,* 670 So. 2d at 877-878 (principal was engaged in the

performance of discretionary function in making a decision regarding the remedying of a

dangerous condition on school grounds); *Byrd v. Sullivan*, 657 So. 2d at 833 (principal was

performing a discretionary function when handling one student's attack upon another); *Hayes ex.*

*rel. Hayes v. Walters*, 628 So. 2d 558 at 560 (principal was immune from civil liability for

injuries students sustained during a gymnastics class because principal's indirect supervisory

responsibilities over the class involved performance of discretionary functions); *Nance ex. rel.*

16

*Nance v. Matthews*, 622 So. 2d at 300-302 (school principal, nurse and supervisor of special education were acting in a discretionary manner in supervising and retaining an aide); *Carroll ex. rel. Slaught v. Hammett* 744 So. 2d 906 at 910-911 (assistant principal was entitled to discretionary function immunity because he was exercising his judgment in handling one student's threats against another); *Coyle v. Harper* 622 So. 2d 302 (Ala. 1983) (teacher was entitled to qualified immunity when one student was injured by another in the classroom while the teacher was  monitoring the halls); *Boyett by Boyett v. Tomberlin*, 678 So. 2d 124, 127 (Ala. Civ. App. 1995) (teacher was entitled to immunity when she exercised her discretionary authority in refusing a student's request to leave the classroom).

The Alabama Supreme Court has stated that "discretionary functions are characterized by planning tasks, and policy-level decision-making." *Ex parte Kelley*, 739 So. 2d at 1096 (citations omitted).  Discretionary acts require exercise in judgment and choice and involve what is just and proper under the circumstances.  *Carroll*, 744 So. 2d at 911 (holding that an assistant principal was immune from tort claim because he was performing a discretionary function in handling a student's threats against another student).  The Alabama Supreme Court has further stated that:

> . . .a governmental agent is immune from civil liability where the conduct made the basis of the claim against the agent is based upon the agent's formulation of plans, policies, or designs, or the agent otherwise makes decisions such as those made in the context of the following activities:
>
> (1) making administrative adjudication;
>
> (2) allocating resources;
>
> (3) negotiating contracts;

17

(4) hiring, firing, transferring, assigning, or supervising personnel;

(5) activities of law-enforcement and correctional officers in arresting, attempting to arrest or releasing persons;

(6) all other instances where acts or decisions including those concerning the safety, health, well-being, fitness, competence, development, or confinement of persons, cannot be challenged without imposing a burden arising from interference with a co-equal branch of government that exceeds the benefit of the challenging party's right to a judicial remedy.

*Wells v. Storey,* 1999 WL 1065143 *8 (Ala. 1999)(citation omitted). However, immunity is unavailable where the governmental agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law. *Ex parte Cranman*, 2000 WL 1728367, at *8 n.13 (Ala. 2000).

Barney was the Superintendent and Moore was the Assistant Superintendent at all times relevant to Daniel's claims. (Barney Depo. at 13; Moore Depo. at 11.) Each of the defendants' acts alleged to be actionable was characterized by the exercise of judgment and discretion. Defendants' decisions with respect to the amount of safety and security measures provided at the Richards Center involves the allocation of resources, which is a discretionary judgment. *See Wells v. Storey,* 1999 WL 1065143 *8 (Ala. 1999) Defendants' acceptance of the IEP Team's placement decisions involves the supervision of personnel, which is also a discretionary judgment. *See id.* Defendants' involvement in hiring, firing, and supervising personnel, which is relevant to Daniel's negligent supervision claim, is a discretionary judgment. *See id.* The conduct of which Daniel complains is of the kind that the Alabama Supreme Court has repeatedly held to be subject to discretionary immunity. Therefore, defendants are immune from Daniel's state law claims.

**B.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
PLAINTIFF'S SECTION 1983 CLAIM.**

Daniel claims that defendants violated her constitutional rights under the Fourteenth

Amendment by their "deliberate indifference to [her] health and well being" by failing to take

any measures to secure the personal safety of [her] and other employees charged with the

counseling and/or education of John Doe." (Pl.'s Compl. ¶ 15.) This claim against defendants in

their personal capacities under 42 U.S.C. § 1983 fails because Daniel cannot meet the "shocks

the conscience" test articulated in *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1992),

and applied by the Eleventh Circuit in *White v. Lemacks*, 183 F.3d 1253 (11th Cir. 1999).

In *Collins*, the Court rejected a widow's claim that her husband's employer, the city

sanitation department, had violated his Fourteenth Amendment due process rights, particularly

his right to be free from unreasonable risk of bodily harm, through its "deliberate indifference

toward the safety of its employees." *Collins*  503 U.S. at 117.  There, the decedent died of

asphyxia after entering a manhole. *See id.*  His widow alleged that the city had not trained its

employees regarding the dangers of working in sewer lines and manholes, had not provided

safety equipment at job sites, and had not provided safety warnings. *See id.*  The court held that

the government or its official can only be held liable for alleged § 1983 violations when their

conduct "can properly be characterized as arbitrary [] or conscience-shocking." *Id*. at 128.  The

*Collins* court concluded that the city department's failure to warn employees about even *known*

risks was not arbitrary or conscience-shocking and did not violate the Due Process Clause of the

Fourteenth Amendment. *Id.* at 128-29.

The *Collins* court acknowledged that it had "previously rejected claims that the Due

Process Clause should be interpreted to impose federal duties that are analogous to those

19

traditionally imposed by state tort law." *Id.* Because the Due Process Clause is merely a

limitation on the State's power to act, rather than a guarantee of certain minimal levels of safety

and security, it does not impose an affirmative obligation on the State to ensure that an

individual's interests in life, liberty, and property are harmed. *Id.* at 126-27. The Due Process

Clause does not guarantee a workplace that is free from unreasonable risks. *Id.* at 129.

Daniel says she was deprived of her constitutional right of protection from bodily injury

because defendants failed to provide her with a safe workplace, or that they were deliberately

indifferent to her safety. Under the Supreme Court's holding in *Collins*, Daniel has no

constitutional right to a workplace free from unreasonable risks. *See id.* at 129.

The *Collins* court further stated that "[o]ur refusal to characterize the city's alleged

omission in this case as arbitrary in a constitutional sense rests on the presumption that the

administration of government programs is based on a rational decision making process that takes

account of competing social, political, and economic forces." *Id.* at 128. Government officials

must routinely make decisions concerning the allocation of resources and these decisions are

better made by the government representatives rather than by federal judges. *Id.* at 128-129.

Although *Collins* did not involve a claim of individual liability, the Eleventh Circuit in

*White v. Lemacks*, applied the arbitrary or conscience-shocking standard to a plaintiff's claim

brought against a sheriff and deputy sheriff in their official and individual capacities. *See* 183

F.3d 1253 (11th Cir. 1999). The *White* court held that "deliberate indifference to the safety of

government employees in the workplace . . . does not rise to the level of a substantive due

process violation under the Federal Constitution." 183 F.3d at 1265. The court found that state

officials' alleged failure to adequately protect prison nurses from an inmate convicted of

20

aggravated assault failed to meet such a standard. *Id.* "[W]here non-custodial relationships are involved, the government can be held liable under the substantive due process clause only where an official's act or omission is 'arbitrary [] or conscious shocking.'" *Id.* at 1257 (quoting *Collins,* 503 U.S. at 128. *Collins* and *White* make it clear that a state-employee relationship, in and of itself, is not a "special relationship" giving rise to a constitutional duty to protect individuals from harm by third parties. *Id.* at 1257-58.

Recently the Eleventh Circuit addressed whether, under a supervisory liability theory, a school superintendent could be held individually liable under §1983 for the sexual abuse of a student by a school employee. *Hartley v. Parnell*, 193 F.3d 1263 (11th Cir. 1999). The court stated that it was the school employee, rather than the defendant, who had deprived the student of her substantive due process rights by sexually abusing her because the defendant had not participated in the abuse and had no actual notice that the employee might commit such abuse. *Hartley*, 193 F.3d. at 1269. Quoting an earlier Eleventh Circuit decision, the court stated that actual notice only exists when "a history of widespread abuse put the [defendant] on notice of the need to correct the alleged deprivation of [due process rights], and he fails to do so." *Id.* The court further stated that "[t]he deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Id.*, quoting *Brown v. Crawford*, 906 F.2d 667 (11th Cir. 1990). Here, although Doe had committed violent acts at Hibbett, none had occurred at the Richards Center before or after Doe's placement until May 1, 1998.

Daniel's assertion that Doe's placement at the Richards Center constituted an affirmative deprivation of her due process right to be free from bodily harm has no factual or legal basis.

Barney and Moore were not the decision-makers behind that placement; the highly professional and knowledgeable IEP team members, *including Daniel*, were.  (Kingsley Depo. at 65.; Daniel Depo., Ex. 1 attached thereto.)

Furthermore, Daniel's claim that Moore's supervisory role over Kingsley rendered her an actual participant in the IEP team's decision is without merit.  (Pl's Brief at 45-48.)  Daniel concedes that "the IEP Committee technically made the decision."  However, Daniel says Moore is still liable for that decision, since she "can make herself a member of the IEP Committee, and can make recommendations to it [and] [s]he can, in her discretion, trigger the revisiting of an IEP for the purpose of changing a placement" (*Id*. at 47).  The notion that Moore's supervisory capacity makes her liable for *all* IEP team placements is beyond all reason.  Although Moore *could have been* a member of Doe's IEP team, she was not.  The IEP team consisted of people most knowledgeable about the student; here, that included Kingsley, Doe's mother, and Daniel. Also, Moore did not participate in the IEP team's placement of Doe, nor did she make any recommendations to the team when it convened.  While Moore can convene an IEP for re-placement purposes, she had no reason to do so in this instance, because until May 1, 1998, Doe's response to the Richards Center placement had not been unfavorable.  Moore simply accepted the competent and informed judgment of the IEP Team.  Rather than complaining of Doe's placement at the Richards Center, Daniel herself drafted the IEP revision allowing Doe to remain at the Center for additional time during the day.  (Daniel Depo. at 81.)

Even assuming that defendants were in a position to determine Doe's placement and failed to do so, this "omission" does not shock the conscience.  First of all, defendants lacked the detailed knowledge of Doe's behavioral history that Daniel had.  (Daniel Depo. at 53-58; Moore

Depo. at 88; Barney Depo. at 173-175.) Federal law dictates that the IEP team, not the

superintendent or assistant superintendent, establish the IEP and make a placement

determination. *See* 20 U.S.C. §1414. Here, the IEP team decided Doe's placement. Daniel

Depo. at 80-81, and Ex. 1 attached thereto.) Moore merely relied on the professional judgment

of Daniel and Kingsley in their placement decision. (Moore Depo. at 169.) At most, Moore

failed to reverse Daniel and Kingsley's decision. Relying on subordinates who are most

qualified to make decisions that federal law requires them to make does not rise to the level of

deliberate indifference.

　　　　Daniel claims that, in addition to defendants' allegedly conscience-shocking decision to

place Doe at the Richards Center, defendants failed to protect her from Doe's assault that

"foreseeably, took place." (Pl.'s Brief at 19.) Yet, Daniel testified that she never told Barney or

Moore that she believed she was not in a secure location, nor did she suggest to Barney or Moore

that other plans should be made to deal with the student in question. (Daniel Depo. at 11, 18.)

Daniel never personally told Moore that she was afraid of this student. (Daniel Depo. at 69.) In

fact, Daniel does not recall ever speaking with Barney or Moore regarding John Doe, other than

when she and the students, including Doe, took muffins that the students had baked to sell to the

staff at the Richards Center. (Daniel Depo. at 73.) Furthermore, Daniel testified that she does

not believe that Moore or Barney put her in harm's way intentionally or that they would want

harm to come to her. (Daniel Depo. at 65.)

　　　　Doe's behavior at the Richards Center in the months prior to May 1, 1998, does not

render Daniel's injury foreseeable. While Doe had been violent in previous placements, (Daniel

Aff., and Ex. 1 attached thereto), after his transfer by the IEP team to the Center he never

23

exhibited any violent behavior toward other students or faculty until the day of the incident. (Daniel Depo. at 44.) In fact, less than two months before her injury, Daniel herself revised Doe's IEP in order for him to stay at the Center for an additional two hours a day. (Daniel Depo. at 38-40.)

Daniel also contends that the "total lack of security measures [allocated to the Richards Center] to protect plaintiff" from Doe's assault constitutes a conscience-shocking omission. (Pl.'s Br., p. 27). However, the Florence system did provide placement alternatives with more security than was available at the Richards Center. For example, Daniel and the other IEP team members were fully aware of the heightened security available at the alternative school, but discarded that facility as a placement option. (Kingsley Depo. at 66-67.) Second, Daniel never communicated even the slightest sense of fear to either of the defendants, both of whom maintained offices within feet of her own. (Daniel Depo. at 32.) In any event, the "least restrictive environment" requirement imposed by federal law obligates a school system to maintain a continuum of placement options ranging from the least secure to highly secure. *See* 34 C.F.R. § 300.551. Doe's IEP Team, not defendants, considered the facts and placed him in the least restrictive environment they deemed to be appropriate, as required by 20 U.S.C. §1412(a)(5)(A). (Kingsley Depo. at 65.)

Plaintiff presents no evidence that defendants' conduct was arbitrary or conscience-shocking, or that defendants were actual participants in the event that caused Daniel's injuries, or that they were on notice of some "obvious, flagrant, rampant" events of "continued duration" sufficient to give rise to liability on their part. Accordingly, Daniel's § 1983 claim is due to be dismissed.

24

**C.    THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON DANIEL'S CO-EMPLOYEE, SAFE PLACE TO WORK AND WILLFUL/RECKLESS CONDUCT CLAIMS.**

**1.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT PURSUANT TO THE EXCLUSIVE REMEDY PROVISIONS OF THE ALABAMA WORKERS' COMPENSATION ACT.**

It is unclear whether Daniel is suing Barney and Moore as her employer or as her co-employee for purposes of her state law claims. If Daniel is suing the defendants in their official capacities, she is suing them as if they were her employer. "Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials." *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991). Indeed, suit against individual officers in their official capacities is "...simply 'another way of pleading an action against an entity of which an officer is an agent.'" *Id.* at 766 (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). "Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents." *Id*.

Therefore, insofar as this suit is brought against defendants in their official capacities, it is functionally equivalent to a suit against the City of Florence Board of Education ("the Board"), which is Daniel's employer. Because, in a different suit, Daniel was awarded workers' compensation benefits from her employer, the Board, (Daniel Depo., Ex. 10 attached thereto), all her other claims against the Board as her employer are barred. *See* ALA. CODE §§ 25-5-52, 25-5-

25

53 (1975).[11] Because a claim against defendants in their official capacities is a claim against the

Board, such a claim is also barred by Sections 25-5-52 and 25-5-53.

If, however, Daniel is suing defendants as her co-employees, as she alleges in Count V of

her Complaint, she may sue them under Section 25-5-11 of the Code of Alabama, but only if

they are legally responsible for her injury and they acted willfully, as defined by Section 25-5-

11(c):

> (1)  A purpose or intent or design to injure another; and if a person,
> with knowledge of the danger or peril to another, consciously
> pursues a course of conduct with a design, intent, and purpose of
> inflicting injury, then he or she is guilty of 'willful conduct;
>
> (2)  The willful and intentional removal from a machine of a safety
> guard or safety device provided by the manufacturer . . . ;
>
> (3)  The intoxication of another employee of the employer . . . ;

------

[11]  These sections provide that

> Except as provided in [the workers' compensation act], no
> employee of any employer subject to this chapter... shall have a
> right to any other method, form, or amount of compensation or
> damages for an injury or death occasioned by an accident or
> occupational disease proximately resulting from and while
> engaged in the actual performance of the duties of his or her
> employment and from a cause originating in such employment or
> determination thereof. ALA. CODE § 25-5-52.
>
> The rights and remedies granted in [the workers' compensation
> act] to an employee shall exclude all other rights and remedies of
> the employee...by statute, or otherwise on account of injury, loss of
> services or death.  Except as provided in this chapter, no employer
> shall be held civilly liable for personal injury to or death of the
> employer's employee, for purposes of [this act], whose injury or
> death is due to an accident or to an occupational disease while
> engaged in the service or business of the employer, the cause of
> which accident or occupational disease originates in the
> employment. ALA. CODE § 25-5-53.

> (4) Willful and intentional violation of a specific written safety
> rule of the employer after written notice to the violating employee
> by another employee, within six months after the date of receipt of
> the written notice suffers injury . . .

ALA. CODE § 25-5-11(c)(1-4). *See also, Thermal Components, Inc. v. Golden*, 716 So. 2d 1166,

1168 (Ala. 1998). Daniel cannot meet this heavy burden, because she presents no evidence of

intent to injure another or intent to violate a safety rule.

Since Daniel and Barney are immune from liability for any claims against them that are

covered by the exclusive remedy provisions of the Alabama Workers' Compensation Act, and

Daniel cannot show willful intent by these defendants,[12] all claims against these defendants are

due to be dismissed.

### 2.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO EVIDENCE OF WILLFULNESS.

In Count III, Daniel alleges that defendants "willfully and/or intentionally and/or

recklessly and/or wantonly failed to maintain and/or failed to formulate efficient safety systems

and safety procedures to ensure the physical safety of counselors and/or teachers and/or other

employees, knowing that injury or death was substantially likely to occur." (Pl.'s Compl. ¶ 21.)

In Count IV, Daniel asserts a claim under Alabama's Safe Place to Work Act, Section 25-1-1 of

the Code of Alabama.[13]   In Count V of her Complaint, Daniel asserts a claim against the

---

[12] The evidence is clear, by Daniel's own testimony, that defendants did not act intentionally. (Daniel Depo. at 65.)

[13] In Count IV, Daniel asserts a claim under Sections 25-1-11 and 25-5-11, and in Count V, asserts a claim under Section 25-5-11. In the interest of clarity and efficiency, the court considers all of Daniel's Section 25-5-11 co-employee claims under Count V. Moreover, both parties recognize that there is no Section 25-1-11, and that Daniel intended to refer to Section 25-1-1 in Count IV. (*See* Def.'s Brief at 31; Pl.'s Brief at 37.) Therefore, the court treats

27

defendants based upon Alabama's co-employee statute, Section 25-5-11 of the Code of Alabama, in Count V of her Complaint. Each of these claims require plaintiff to prove defendants acted willfully. Plaintiff has put forth no evidence on which a reasonable jury could find that she has met this burden.

### a. Willful/Intentional/Reckless Conduct (Count III)

There is no evidence in this case that Barney and Moore acted willfully, intentionally, recklessly and/or wantonly. In fact, Daniel testified that she did not believe defendants acted intentionally. (Daniel Depo. at 65.) Daniel's claim asserted in Count III of her Complaint is strikingly similar to her claim in Count IV brought under Alabama's Safe Place to Work Act, and her co-employee claims brought under Section 25-5-11(c)(1), both of which require evidence of "substantial certainty" that injury or death would occur. There is no such evidence here. The evidence reflects that Barney had no knowledge of a potential danger and Moore did nothing more than rely on Daniel and Kingsley. Accordingly, defendants are entitled to judgment as a matter of law on Count III of Daniel's Complaint.

### b. Co-Employee Claim (Count V)

Under Section 25-5-11 of the Code of Alabama, co-employees are entitled to qualified immunity on claims that do not rise to the level of willfulness required of claims brought under that statute. *See Jones v. Roe*, 611 So. 2d 345 (Ala. 1992). Because there is no claim in this case that defendants removed a safety guard or device, were intoxicated, or violated a specific written safety rule after written notice had been provided, the court must assume that Daniel's co-employee claim is predicated upon Section 25-5-11(c)(1) of the Code of Alabama, which sets

---

Count IV as alleging a claim under Section 25-1-1.

forth the manner in which an employee may maintain an action against a co-employee for injuries occurring in the workplace.   A plaintiff asserting a claim under Section 25-5-11(c)(1) must prove either (1) the reason why the co-employee defendant would want to harm the plaintiff or someone else, or (2) that a reasonable man in the defendant's position would have known that injury or death was substantially certain to follow from his actions. *See Reed v. Brunson*, 527 So. 2d 102, 120 (Ala. 1988).  The Alabama Supreme Court has considered claims brought pursuant to Section 25-5-11(c)(1) on many occasions, and has, without exception, held that no jury question was presented as to whether the "substantially certain" test was met.[14]

The Alabama Supreme Court pointed out in *Pitts v. Beasley* "that [a]n employee seeking to recover under [Section 25-5-11(c)(1)] carries a heavy burden ... Evidence showing only knowledge and an appreciation of the risk of injury or death, short of a substantial certainty that injury or death would occur, is insufficient for the purpose of showing willful conduct under subsection (c)(1)." 706 So. 2d 711, 714-15 (Ala. 1997).  Indeed, the Alabama Supreme Court has repeatedly emphasized that a co-employee defendant is entitled to a judgment as a matter of law where the plaintiff produced evidence to show that the defendant was aware of a risk of injury, even if the risk was one which would likely or even probably result in harm or even death, where there was no evidence of substantial certainty. *See, e.g., Williams v. Price*, 564 So. 2d 408 (Ala. 1990); *Bean v. Craig*, 557 So. 2d 1249 (Ala. 1990).

---

[14] *See Pitts v. Beasley*, 706 So. 2d 711 (Ala. 1997); *Townsend v. General Motors Corp.*, 642 So. 2d 411 (Ala. 1994); *Grimes v. Stewart*, 628 So. 2d 467 (Ala. 1993); *Harris v. Simmons*, 585 So. 2d 906 (Ala. 1991); *Padgett v. Neptune Water Meter Co.*, 585 So. 2d 900 (Ala. 1991); *Merit v. Cosby*, 578 So. 2d 1242 (Ala. 1991); *Beville v. Spencer*, 568 So. 2d 1224 (Ala. 1990); *Landers v. O'Neal Steel, Inc.*, 564 So. 2d 925 (Ala. 1990); *Bean v. Craig*; 557 So. 2d (Ala. 1990); *Burkett v. Loma Machine Mfg., Inc.*, 552 So. 2d 134 (Ala. 1989); *Turnbow v. Kustom Kreation Vans*, 535 So. 2d 132 (Ala. 1988); *Reed v. Brunson*, 527 So. 2d 102 (Ala. 1988).

Here, there is no evidence that Barney was even aware of a risk of injury, much less that he was "substantially certain" that a risk would probably result in harm. There is also no evidence that Moore was aware of a substantial certainty that injury would occur to Daniel. Moore relied on Daniel. There was no prior violence at the Richards Center. The evidence falls short of meeting the required "substantially certain" test. Accordingly, Daniel's co-employee claim against defendants is due to be dismissed.

### c. Safe Place to Work Claim (Count IV)

Daniel asserts a claim against Barney and Moore for failing to provide her with a safe place to work. Section 25-1-1 of the Code of Alabama imposes a duty on employers to provide employees with a reasonably safe workplace. *See Morris v. Merit Oil Co.*, 686 So. 2d 1139, 1142 (Ala. 1996). The Alabama Supreme Court has held that "the duty to provide a safe workplace is imposed upon "the one who has control or custody of the employment or place of employment." *Morris*, 686 at 1142 (citing *Proctor & Gamble Co. v. Staples*, 551 So. 2d 949, 951 (Ala. 1989)). Barney and Moore were not Daniel's employers. In any event, Daniel's safe workplace claim is barred pursuant to the provisions of Sections 25-5-52 and 25-5-53 of the Code of Alabama.

Even if Daniel's claim were not barred, the evidence does not meet the standard of proof required for employer liability. The Alabama Supreme Court has further stressed that "evidence of some potential danger or possibility of harm is not enough. It is only when the risk reaches the stage that injury to the employee is the likely or probable result of the condition of employment that liability attaches." *Parham v. Taylor,* 402 So. 2d 884, 886-887 (Ala. 1981),

30

quoting *Thoni Oil Magic Benzol Gas Stations, Inc. v. Johnson*, 488 S.W.2d 355 (KY 1972). The

court in *Parham* further concluded as follows:

> We agree with the rationale of the *Thoni Oil* case and re-emphasize
> that an action such as this will not lie except in the most extreme
> case where it is clearly shown that the employer in some manner,
> greatly and unreasonably, increased the risk to the employee
> without taking reasonable safety precautions.

*Parham*, 402 So. 2d at 887. The *Parham* test specifically requires a showing that (1) the

employer "greatly and unreasonably increased the risk to the employee" of being injured by

criminal activity, and (2) the employer did not take reasonable safety precautions to prevent such

an injury. There is no evidence in this case to satisfy either of these requirements. *See Gaskin v.*

*Republic Steel Corp.*, 427 So. 2d 37 (Ala. 1982). Accordingly, Daniel's safe workplace claim

against defendants as her "employer" fails.

Daniel's safe workplace claim also fails to the extent it is against defendants as plaintiff's

co-employees, because her claims fall short of the burden of proof established by the Alabama

Supreme Court requiring evidence of willfulness. In order to maintain a claim against

defendants, as her co-employees, for failure to maintain a safe place to work, Daniel must have

evidence that Barney and Moore acted willfully. *Thermal Components, Inc. v. Golden*, 716 So.

2d 1166, 1168 (Ala. 1998).

Daniel has not presented any evidence of willfulness on the part of defendants. Thus,

plaintiff's co-employee claim against defendants is due to be dismissed.

## D.     THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
##        DANIEL'S CLAIM FOR OUTRAGE.

Daniel claims that Barney and Moore were guilty of outrageous conduct by failing to

secure her safety from physical harm when, she alleges, they were on notice of eminent danger.

31

(Plaintiff's Complaint, ¶ 18).  Although the tort of outrage is not barred by the exclusive remedy doctrine,  Daniel has presented absolutely no evidence to support a claim for outrage.  The Alabama Supreme Court "has consistently held that the tort of outrage is a very limited cause of action that is available only in the most egregious circumstances.  As a consequence, [the supreme court] has held in a large majority of the outrage cases reviewed that no jury question was presented." *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993). The evidence presented by Daniel does not even approach the level of evidence necessary to support this "very limited cause of action," and summary judgment is due to be entered in the defendants' favor.

   To establish a claim for outrage, "the plaintiff must show that (1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff distress; and (4) the distress was severe." *Shepherd v. Summit Mgmt. Co., Inc.,* 726 So. 2d 686, 694 (Ala. Civ. App. 1998) (citing *Harris v. McDavid*, 553 So. 2d 567 (Ala. 1989)).  To prevail here, Daniel must establish that the defendants' conduct was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Ex parte Lumbermen's Underwriting Alliance,* 662 So. 2d 1133, 1136 (Ala. 1995), quoting *American Road Serv. Co. v. Inmon*, 394 So. 2d 361 (Ala. 1980).  The Alabama Supreme Court has emphasized that "[u]nder [the Alabama Supreme Court's] decisions the burden on the plaintiff to make out a case of outrageous conduct is heavy." *Garvin v. Shewbart*, 442 So. 2d 80, 83 (Ala. 1983) (citation omitted).  There is no evidence before the court suggesting that either defendant intended to

inflict emotional distress or knew or should have known that emotional distress was likely to result from his or her conduct. Accordingly, Daniel's outrage claim is due to be dismissed.

## E.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON DANIEL'S CLAIM FOR NEGLIGENT SUPERVISION.

Daniel claims that "defendants negligently and/or recklessly and/or wantonly and/or willfully supervised and/or trained and/or hired its employees." (Plaintiff's Complaint, ¶ 39). In her complaint, Daniel did not specify to whom she was referring that defendants negligently and/or recklessly . . . supervised/trained or hired. However, at the hearing on this matter, Daniel argued that Barney negligently supervised or trained his principals, including Jim Smith, because he did not ensure that they comply with Alabama law regarding notification to the superintendent of assaults on teachers and employees. This claim is without merit.

First, a negligent supervision claim is typically asserted against the employer, but Daniel is precluded from pursuing a  negligence claim against her employer because of the exclusive remedy provision of the Alabama Workers' Compensation Act. Furthermore, if Daniel is asserting this claim against Barney (and potentially Moore) as her co-employees, she must proceed under the stringent guidelines provided in §25-5-11 of the Code of Alabama requiring that willful conduct be shown. As noted, Daniel has presented no evidence of willful conduct on the part of either defendant.

Furthermore, the Alabama Supreme Court has held that an employer may not be held liable for negligent hiring, supervision, or training where the plaintiff failed to prove that the employer was aware or should have been aware that the employee was likely to engage in the conduct that injured the plaintiff. The Alabama Supreme Court has explained the circumstances under which an employer may be held liable on negligent supervision claims as follows:

33

> Liability depends upon its being established by affirmative proof
> that such incompetency was actually known by the master or that,
> had he exercised due and proper diligence, he would have learned
> that which would charge him in the law with such knowledge.

*Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981, 987 (Ala. 1999)(citation

omitted). *See also Big B, Inc. v. Cottingham,* 634 So. 2d 999, 1003 (Ala. 1993); *Lane v. Central

Bank of Ala., N.A.,* 425 So. 2d 1098, 1100 (Ala. 1983).

In cases in which courts have found that a jury question was presented on a claim for

negligent supervision or training, the plaintiff has presented evidence that the employer was

aware of the employee's "incompetency." *See Big B.,* 634 So. 2d at 1003-04; *Machen v.

Childersburg Bancorporation, Inc.,*761 So. 2d at 987. Here, there is no evidence that any

employee, including any who allegedly failed to make the proper reports to Barney, was unfit for

his or her position, incompetent, or likely to engage in any conduct that injured Daniel.

Moreover, there is no evidence that defendants had any knowledge of any alleged incompetency

of Jim Smith or any other principal or other employee.

In cases where the plaintiff failed to present evidence that the employer knew or should

have known that the employee was likely to engage in the conduct that injured the plaintiff,

courts have held that the employer was entitled to a summary judgment on claims for negligent

supervision or training. *See Mardis v. Robbins Tire & Rubber Co.,* 669 So. 2d 885, 889-890

(Ala. 1995); *Lane v. Central Bank of Ala., N.A.,* 425 So. 2d 1098, 1100 (Ala. 1983); *Sanders v.

Shoe Show, Inc.*, 778 So. 2d 820, 827 (Ala. Civ. App. 2000); *Anonymous v. Lyman Ward

Military Academy*, 701 So. 2d 25, 28-29 (Ala. Civ. App. 1997). Accordingly, defendants are

entitled to summary judgment on Daniel's negligent supervision claim.

## **CONCLUSION**

Based on the foregoing, the court is of the opinion that defendants' Motion for Summary

Judgment is due to be granted as to all of plaintiff's claims. An Order in accordance with this

Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 26th day of September, 2001.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge